**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br>     v. <br><br> ISHAN WAHI, <br><br>              Defendant. | No. 22-cr-392 (LAP) |

## <u>SENTENCING MEMORANDUM OF ISHAN WAHI</u>

David I. Miller
Charles J. Berk
Greenberg Traurig, LLP
One Vanderbilt Avenue
New York, New York 10017
(212) 801-9200
David.Miller@gtlaw.com

Andrew St. Laurent
Harris St. Laurent & Wechsler LLP
40 Wall Street
New York, NY 10005
(212) 397-3370
andrew@hs-law.com
*Counsel for Defendant Ishan Wahi*

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT.......................................................................1

II.  ISHAN WAHI'S PERSONAL HISTORY AND CIRCUMSTANCES.........3

   A. Ishan's upbringing was marked with a focus on education and hard
      work ...........................................................................................................3

   B. Ishan is devoted to his family and friends ..................................................6

   C. Ishan's life is marked with events of generosity and kindness.................7

   D. Ishan has dedicated a substantial part of his life towards uplifting
      society ........................................................................................................9

   E. The instant actions are an isolated mistake in the context of Ishan's
      entire life ..................................................................................................11

   F. Ishan's struggles in the aftermath of his arrest .......................................12

   G. Ishan's mistake has put his relationship in jeopardy ..............................14

III. THE ADVISORY GUIDELINES CALCULATIONS ................................16

   A. The Plea Agreement and Plea....................................................................16

   B. The Agreed-Upon Offense Conduct .........................................................17

IV.  CONSIDERATION OF ALL THE PERTINENT SENTENCING
     FACTORS WARRANTS A NON-GUIDELINES SENTENCE ................19

   A. Applicable Sentencing Provisions ...........................................................19

   B. The Gain Calculations Overweight the Gain as a Factor.........................20

   C. Section 3553(a) Factors Strongly Favor a Non-Guidelines
      Sentence ....................................................................................................24

      1. Ishan's Personal Characteristics.................................................26

2.  Ishan Has Accepted Responsibility ...............................................31

3.  Nature and Circumstances of the Offense; Need for Sentence to
Reflect the Seriousness of the Offense ......................................32

4.  Need for Sentence to Provide Specific Deterrence ...............................33

5.  Need for Sentence to Provide General Deterrence ...............................35

6.  Need to Provide the Defendant with Medical Care in the Most
Effective Manner.................................................................38

7.  Need to Avoid Unwarranted Sentencing Disparities ...........................39

V.   CONCLUSION ...........................................................................47

# TABLE OF AUTHORITIES

**Cases**

*Dean v. United States*
   137 S. Ct. 1170 (2017) ........................................................................26

*Gall v. United States*
   552 U.S. 38 (2007) .............................................................................24

*Kimbrough v. United States*
   552 U.S. 85 (2007) .............................................................................24

*Padilla v. Kentucky*
   559 U.S. 356 (2010) ...........................................................................45

*United States v. Adelson*
   441 F. Supp. 2d 506 (S.D.N.Y. 2006) ...........................................26, 27

*United States v. Algahaim*
   842 F.3d 796 (2d Cir. 2016) ...............................................................22

*United States v. Allen*
   644 F. Supp. 2d 422 (S.D.N.Y. 2009) .................................................31

*United States v. Bello-Gobea*
   No. 12 CR 114-01 RWS, 2013 WL 5512829 (S.D.N.Y. Oct. 4, 2013) ..............45

*United States v. Blaszczak*
   17 Cr. 357 (LAK) (S.D.N.Y. Sept. 13, 2018) ......................................21

*United States v. Burghardt*
   702 F. App'x 4 (2d Cir. 2017) ............................................................22

*United States v. Canova*
   412 F.3d 331 (2d Cir. 2005) ...............................................................30

*United States v. Chow*
   17-cr-667 (GHW) (S.D.N.Y 2017) .....................................................42

*United States v. Corsey*
   723 F.3d 366 (2d Cir. 2013) ...............................................................23

*United States v. Crosby*
    397 F.3d 103 (2d Cir. 2005)..................................................................19, 25

*United States v. DiMattina*
    885 F. Supp. 2d 572 (E.D.N.Y. 2012) ................................................30

*United States v. Emmenegger*
    329 F. Supp. 2d 416 (S.D.N.Y. 2004)..................................................22

*United States v. Gaind*
    829 F. Supp. 669 (S.D.N.Y. 1993)........................................................35

*United States v. Gomez*
    11-cr-96 (RWS), 2013 U.S. Dist. LEXIS 30219 (S.D.N.Y. Feb. 27, 2013)........31

*United States v. Gonzales*
    884 F.3d 457 (2d Cir. 2018)..................................................................45

*United States v. Gupta*
    904 F. Supp. 2d 349 (S.D.N.Y. 2012)..........................................21, 24

*United States v. Howe*
    543 F.3d 128 (3d Cir. 2008).................................................................29

*United States v. Peltz*
    21-cr-154 (E.D.N.Y 2023) ...........................................................42, 43

*United States v. Johnson*
    No. 16-CR-457-1 (NGG), 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018)...........22

*United States v. Jones*
    460 F.3d 191 (2d Cir. 2006)..................................................................25

*United States v. Jung*
    18-cr-518 (LAK) (S.D.N.Y. 2019) ......................................................42

*United States v. Navarro-Diaz*
    420 F.3d 581 (6th Cir. 2005) ...............................................................46

*United States v. Park*
    758 F.3d 193 (2d Cir. 2014)...................................................................25

*United States v. Pickens*
    05-cr-793 (LAP) (S.D.N.Y. 2007) .......................................................42

*United States v. Pinto-Thomaz*
    18-cr-579 (JSR) (S.D.N.Y. 2018) ...............................................38, 41

*United States v. Rioux*
    97 F.3d 648 (2d Cir. 1996).....................................................................30

*United States v. Rosario*
    12-cr-403 (RWS), 2012 U.S. Dist. LEXIS 135695 (S.D.N.Y. Sep. 19, 2012)....31

*United States v. Stewart*
    590 F.3d 93 (2d Cir. 2009)......................................................................35

*United States v. Tomko*
    562 F.3d 558 (3d Cir. 2009)....................................................................30

*United States v. Velazquez*
    No. 16-CR-233 (AKH), 2017 WL 2782037 (S.D.N.Y. May 26, 2017) .............36

*United States v. Wahi*
    22-cr-392 (S.D.N.Y. 2023) ....................................................................36

**Statutes**

8 U.S.C. § 1226 ...........................................................................................15

18 U.S.C. § 1349 .........................................................................................11

18 U.S.C. § 3553 ..................................................................................passim

**Other Authorities**

Alan Ellis and Mark Allenbaugh, *Mental Health Care in the Bureau of Prisons*,
    The National Trial Lawyers, Apr. 13, 2017........................................39

Richard A. Frase, A More Perfect System: Twenty-five Years of Guidelines
    Sentencing Reform (Punishment Purposes), 58 STAN. L. REV. 67 (2005) .......37

USSG § 2B1.1 .................................................................................................16, 20

USSG § 2B1.4 .................................................................................................16, 39

USSG § 3B1.3 ......................................................................................................16

USSG § 3D1.2 ......................................................................................................16

USSG § 3E1.1 .......................................................................................................16

USSG § 4C1.1 .................................................................................................44, 45

USSG § 5C1.1 ......................................................................................................44

USSG § 5D1.1 ......................................................................................................45

USSG § 5K1.1 .................................................................................................40, 43

# EXHIBIT LIST

Exhibit 1 – Ananya Kapoor Letter………………………………………...6, 8, 27

Exhibit 2 – Nandita Saxena Letter……………………………………………6, 27

Exhibit 3 – Natasha Minocha Letter…………………………………………7, 27

Exhibit 4 – Mohini Chopra Letter……………………………………………7, 13

Exhibit 5 – Hemant Batra Letter………………………………………………7

Exhibit 6 – Vishnu Sharma Letter…………………………………………...7, 27, 29

Exhibit 7 – Shantu Jain Letter………………………………….................7, 28

Exhibit 8 – Sanjay Tourani Letter…………………………………………...7, 14, 28

Exhibit 9 – Sneha Srinidhi Letter……………………………………………..8, 28

Exhibit 10 – Sahil Jain Letter…………………………………….................9, 28

Exhibit 11 – Vinod Karate Letter…………………………….………….......10, 11, 29

Exhibit 12 – Suvidhi Khurana Letter…………………………….………........11, 29

Exhibit 13 – Maike Reutler Letter…………………………….……….............8, 28

Exhibit 14 – Bianca Habib Letter…………………………….………........9, 14, 28, 29

Exhibit 15 – Jai Sahai Endlaw Letter……………………….……….............9, 28

Exhibit 16 – Dr. Kimberly MacEachern Letter…………………….………...14

Exhibit 17 – USSC Statistical Information Packet 2019…………………………...43

Exhibit 18 – USSC Statistical Information Packet 2020…………………………...43

Exhibit 19 – USSC Statistical Information Packet 2021…………………………...43

This Sentencing Memorandum is respectfully submitted on behalf of defendant Ishan Wahi.  On February 7, 2023, Ishan pleaded guilty to two counts of conspiracy to commit wire fraud and accepted full responsibility for his actions. For the reasons set forth below, Ishan respectfully requests that the Court impose a non-guidelines sentence that is in line with similarly-situated defendants in this District.

## I.      PRELIMINARY STATEMENT

Bryan Stevenson famously said "Each of us is more than the worst thing we've ever done." Just Mercy: A Story of Justice and Redemption, 17 (One World 2014).  This is as true for Ishan as it is true for everyone else.

As described in detail below, and in the many letters from his friends, colleagues, and family that accompany this submission, Ishan is a young man with great gifts and accomplishments, with an exceptionally kind and generous heart, and a commitment to serving the world's most disadvantaged. Prior to the conduct that led to his conviction, Ishan lived a modest, law-abiding, and admirable life, rooted in the values of family, education, and success through hard work that this country holds dear.  The letters show that above all, he is selfless, and goes out of his way to help those around him.  This is not just rhetoric.  Not many people choose to work at non-profits.  Even fewer choose to leave a promising career in

the United States to start a non-profit, especially after years of hard work and time away from family to establish a career in the United States in the first place.

This memorandum clearly illustrates that Ishan is a man of outstanding character who crossed the line.  His conduct has threatened his well-being, his family's, and his personal relationships. Ishan's name has been associated with the events of this case, and he will forever be a Google search away from being known as the first insider to be convicted in a "cryptocurrency insider trading" case.  His promising career has ended instantly, with no realistic prospects of similar employment in the future.  Given his immigration status, his future in the United States with his long-time girlfriend is at best uncertain.  No matter what happens at sentencing, Ishan's conduct has already placed everything he worked and planned for his entire life irretrievably out of reach.

Ishan is a good, generous, and kind person.  He was so before the conviction in this case and he will be so afterwards.  These qualities are important for the Court to consider.  Section 3553(a)(1) requires the Court to consider "the history and characteristics of the defendant" as well as the "the nature and circumstances of the offense."  Further, Section 3553(a)(2) requires the Court to consider the "need for the sentence imposed" to reflect a "just punishment," to provide "adequate deterrence," "to protect the public from further crimes of the defendant," and "to provide the defendant with needed educational or vocational

2

training." Ishan's personal qualities factor into each and every one of these considerations. It is respectfully submitted that given Ishan's accomplishments, established history of good works, and acceptance of responsibility all weigh in favor of, at most, a moderate sentence of incarceration.

To this end, the Defendant respectfully submits that a sentence of no more than 10 months incarceration, together with several other consequences of Ishan's conviction, would impose a sufficient, but not excessive, punishment for the crimes of conviction.

## II.   ISHAN WAHI'S PERSONAL HISTORY AND CIRCUMSTANCES

### A.   Ishan's upbringing was marked with a focus on education and hard work

Ishan Wahi was born on June 20, 1990, in New Delhi, India, to Kavita and Sanjay Wahi. (PSR, ¶ 61).[1] Ishan Wahi grew up in a middle-class family in New Delhi, India. His parents and grandparents continue to reside in India. His father, Sanjay Wahi is a retired fabric wholesaler, who suffers from degenerative back problems, sciatica, high blood pressure, and anxiety. Kavita Wahi is an owner of a

---

[1] Citations to "PSR" refer to the Presentence Report filed by the United States Department of Probation in this case. Citations are to paragraphs as numbered in the draft PSR that has been provided to the defense. If those paragraph numbers change in the final PSR (which is not expected), the defense will provide an updated version of this memo for the Court with the correct paragraph numbers. Ishan also anticipates submitting a supplemental sentencing addressing Probation's recommendation.

textile company in New Delhi. (*Id.*).  Ishan has one sibling, his brother Nikhil

Wahi, twenty-seven.  Nikhil Wahi is Ishan's co-defendant in this matter and is

currently serving the custodial portion of the sentence imposed by the Court at Fort

Dix Correctional Institution. (PSR, ¶ 62).

Ishan enjoyed a happy childhood in India, with a good relationship with his

immediate family.  He grew up in a joint household with his parents, brother, and

paternal grandparents, and would spend every other weekend with his maternal

grandparents.  Throughout his childhood, Ishan would come to the United States to

visit his extended family.  Ishan attended St. Columba's, a high school in New

Delhi, where he excelled academically and was an avid athlete, playing for his

school's cricket team.  After high school, Ishan traveled to the United States to

pursue his college education at the University of Texas in Austin in 2008.  While

in college, Ishan would work 20 hours a week as a Calculus course assistant, all the

while maintaining a full course load, in order to lessen the financial burden his

family faced in paying for his tuition.

After graduating from the University of Texas with a Bachelor's degree in

Computer Science in 2012 (PSR, ¶ 83), Ishan worked as a software engineer for

PayPal, initially out of its Austin, Texas offices, and later in San Jose, California,

initially earning $80,000 annually.  In 2016, Ishan left PayPal to pursue his passion

of creating a start-up company in the field of education in his native India. (PSR,

4

¶ 89).  Ishan became the co-founder of the not-for-profit organization, TheTeacherApp, a company dedicated to helping teachers in India educate 250 million schoolchildren.[2] Ishan took a dramatic pay cut to take this position, earning an annual salary of just $7,000 at TheTeacherApp, approximately 6% of what he had been earning at PayPal. (PSR, ¶ 88).

        After two years with TheTeacherApp, Ishan returned to the United States in 2018—when the non-profit lost funding—for graduate school with the goal of improving his skills to ultimately start another education company.  Ishan graduated from Carnegie Mellon with a Master's degree in Business Administration in 2020.  Unfortunately, he graduated in the middle of a temporary recession caused by the COVID-19 pandemic.  Over the course of 5 months, Ishan applied to over 100 different companies, sending hundreds of cold emails in the hopes of finding employment.  With persistence and hard work, Ishan was able to secure a job at Coinbase, Inc., the cryptocurrency exchange, in late 2020.  His

---

[2] TheTeacherApp has received considerable attention in the press. See CNBC Coverage as part of "Young Turks to watch out for" — https://www.cnbctv18.com/videos/startup/young-turks-to-watch-out-for-in-2019-1811081.htm;  https://tech.hindustantimes.com/tech/news/google-org-announces-3-million-grants-to-indian-non-profits-story-fYxvebCl0rb3bspv7s9mYP.html (Google.org funds TheTeacheraApp with $1million); https://yourstory.com/2018/03/second-edition-nasscom-startups-list (Top Ten Startups that are "coding for the next billion" award by Facebook); https://www.news18.com/news/india/whatsapp-courses-teachers-apps-niti-aayog-takes-a-lesson-from-state-govts-on-methods-to-reform-education-2047509.html (TheTeacherApp among top choices for education reform in India).

conduct there is described in more detail below.  Ishan was terminated by Coinbase in July 2022.

Following his arrest in this case, Ishan has been unable to gain new employment due to his immigration status in the United States.  Since September 2022, however, he has found purpose as a virtual tutor while volunteering for Seattle Community College in Seattle, Washington, assisting adults studying for the GED and learning the English language.  Ishan also tutors high school students remotely in India who are studying for exams, such as the SATs, and assists them in preparing their college applications. (PSR, ¶ 86).

### B.   Ishan is devoted to his family and friends

Ishan has shown himself to be a dutiful son, a concerned cousin, and a great source of help and comfort to his many relatives.  Ishan's cousin, Ananya Kapoor, writes how Ishan tutored her in math during high school, helped with her college applications in 2012, and was a constant source of comfort as she anxiously awaited the results of those applications. (Kapoor, 2). Nandita Saxena, a family friend, reports Ishan doing the same for her son, at a time when Saxena herself was suffering from cancer. (Saxena, 1).  Natasha Minocha, Ishan's aunt, describes how Ishan helped run errands for his grandparents as a teenager and how, when Ishan was in his 20s, he provided critical technical assistance to Minocha when she started a bakery in 2011, and again when she started a food blog in 2015.

(Minocha, 1).  Mohini Chopra, Ishan's grandmother, tells of how Ishan taught her how to drive after her husband died, and how he helped her navigate the technology she needed to stay in touch with friends and family during the COVID-19 pandemic. (Chopra, 1-2).  Hemant Batra, Ishan's uncle, tells of how Ishan would care for his bedridden grandfather who was suffering from acute Parkinson's disease, carrying him out of bed to sit in the garden with the family. (Batra, 2).

### C.    Ishan's life is marked with events of generosity and kindness

Ishan's college friend and fellow UT Austin student Vishnu Sharma reports how Ishan helped friends prepare for exams or get ready for interviews for jobs and internships. (Sharma, 1).  Sharma reports how Ishan found time to volunteer at dog pounds, helping take care of dogs that had been ignored by society. (*Id.*). Another of Ishan's college friends, Shantu Jain, describes how Ishan gave up his only possession, a car, so that one of their roommates could get around while looking for full-time work. (Shantu Jain, 1).  Not only did Ishan not ask for anything back for the long-term loan, but he would secretly fill the gas tank at night. (*Id.*)  Sanjay Tourani, who also attended the University of Texas, tells of how Ishan bought him a laptop when Tourani could not afford one and let Tourani live with him when Tourani could not afford to pay rent. (Tourani, 1).

7

While working as a software engineer for PayPal, one of Ishan's colleagues, Sneha Srinidhi, reports how at a critical moment in her career, fearful of failing her first assignment as an engineer at PayPal, she went to Ishan for help.  Ishan took the time to walk her through the problem, providing the necessary context that she required to solve the problem and complete the assignment. (Srinidhi, 1).  During his time at PayPal, Ishan also volunteered at a dog shelter in San Jose. (Kapoor, 2).  Srinidhi remembered that Ishan was the one who took care of her beloved dog during her wedding. (Srinidhi, 1).

At Carnegie Mellon, Ishan continued to impress his contemporaries with his generosity.  A fellow student, Maike Reutler, writes that Ishan was the "go to" person for other students who were struggling with assignments, and that Ishan "organiz[ed] and lead[] study sessions to help those of us struggling with the content and homework assignments." (Reutler, 1).  Reutler writes about how Ishan prioritized Reutler's job search, sometimes over his own, in their last year of school, and how Ishan helped her when she moved to Seattle after she got a job at Amazon. (Reutler, 2).

In India, Ishan frequently provides food to the less fortunate whenever he visits.  His girlfriend, Bianca Habib, writes about how Ishan would speak to and aid a blind man who frequented a corner every day to ask for money.  Ishan offered this

man a ride to the bus station where he learned about the lengths this man took to travel every day to better understand all walks of life. (Habib, 3).

### D.     Ishan has dedicated a substantial part of his life towards uplifting society

Ishan began dedicating a part of his life towards helping the most-needy while attending high school at St. Columba's.  One of his friends from high school, Jai Sahai Endlaw, writes of Ishan's work for the "Nine is Mine" campaign, directed at requiring the government of India to spend 9% of the GDP on health and education. (Endlaw, 1).  This was part of a larger focus of Ishan's service to India's poorest children. (Endlaw, 2).

Ishan's colleague at PayPal, Sahil Jain, describes Ishan as "an extremely competent" engineer who was also dedicated to helping others. (Sahil Jain, 1). Jain tells of Ishan's efforts when he was a core member of a team trying to implement a program at PayPal called "Round Up."  "Round Up" was a frictionless savings program modeled after a similar program at Bank of America called "Keep the Change," directed at helping low and moderate income households save by transferring fractional dollar amounts from transactions automatically to savings. (Sahil Jain, 1).  After "Round Up" was halted by PayPal, Jain reports how Ishan first volunteered at a local not-for-profit as a technical advisor, before quitting PayPal altogether to help start a not-for-profit in India. (Sahil Jain, 2).

9

In 2016, Ishan left a flourishing and lucrative role at PayPal to pursue his passion of creating a start-up company in the field of education in his native India, at significant financial cost to himself (PSR, ¶ 89).  Ishan became the co-founder of the not-for-profit organization, TheTeacherApp, a company dedicated to helping teachers in India educate 250 million schoolchildren.  TheTeacherApp made available continuing education to teachers across India, many of them in remote or rural areas, where access to educational services was challenging under the best of circumstances. TheTeacherApp created technology and more than 100 hours of best-in-class content for educating teachers in India, which has been used by more than 4 million teachers and was at the forefront of remote educational efforts in India during the COVID-19 pandemic. (Karate, 1).  Ishan's contributions to TheTeacherApp were of fundamental importance to the company. (*Id.*).  And not just to TheTeacherApp.  Ishan ensured that the software code he wrote for TheTeacherApp was licensed under the Creative Commons license and thus available for use by many other non-profits.  Vinod Karate, TheTeacherApp's co-founder, describes how Teach for India, Kavailya Foundation, Language Learning foundation, Bharti Foundation, and other not-for-profit organizations were able to benefit from Ishan's code because it was made open source.  (*Id.*).  The startup's innovative and impactful work was recognized by many.  Google's philanthropic

10

arm granted $1 million to the startup to expand its work.  The co-founders, including Ishan, were recognized as "Young Turks to watch out for" by CNBC.[3]

On a personal level, Ishan helped create a culture at TheTeacherApp that was welcoming to new mothers and women coming from conservative backgrounds. (*Id.* at 2).  Another one of TheTeacherApp's co-founders, Suvidhi Khurana, describes how Ishan risked his life traveling through conflict-torn parts of India to train District Education officers on how to use the app. (Khurana, 1).

### E.    The instant actions are an isolated mistake in the context of Ishan's entire life

Ishan comes before this Court having pleaded guilty to two counts of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349.  Before this case, Ishan had never been arrested, and there is zero indication that he is a person capable of repeating his conduct.  The indictment and the forfeiture order show that Ishan received very little gain from this scheme.

In all respects, Ishan's conduct was an anomaly, and there is no likelihood of it occurring again. This error in judgment has cost him everything: his career, his health, his relationships, his family's name, and has seriously jeopardized the future of his relationship with his long-term girlfriend.  Ishan has squandered years of hard study in school, tireless years of professional development, and forfeited

---

[3] https://www.cnbctv18.com/videos/startup/young-turks-to-watch-out-for-in-2019-1811081.htm

his ability to work in what was a promising and lucrative career. This incident has also seemingly undone all the goodwill that Ishan has built in his life. He will no longer be known as the man who started a non-profit in India and helped friends through tough times, but as the "Ex-Coinbase Manager who committed insider trading."[4] In Ishan's own words: "This is the worst decision I have taken in my life, and my family and I have paid for it dearly." (PSR, ¶¶ 42, 43)

### F.    Ishan's struggles in the aftermath of his arrest

Ishan had generally enjoyed good physical and mental health prior to his arrest. (PSR, ¶¶ 70-81). Physically, he is in good health, with the only significant limitation being a right knee that is prone to dislocation after a series of sports-related injuries in Ishan's youth.

Psychologically, Ishan is in significantly worse shape today. Following his arrest in May 2022, Ishan spent two days in solitary confinement before his release on conditions in the Northern District of California. Ishan was held at the Alameda County jail, largely in isolation, and with no food and very little ability to communicate with the outside world. (PSR, ¶ 76). During that time, Ishan heard a fellow inmate yelling and screaming out and later saw that inmate being carried out from his cell unresponsive. (*Id*.). Ishan believes that the inmate may have died in

---

[4] https://www.wsj.com/articles/coinbase-insider-trading-case-spearheads-cryptos-latest-bid-to-avoid-sec-oversight-a43bd268

custody, which, along with the other incidents associated with Ishan's arrest and subsequent confinement, have caused Ishan to "mentally spiral" since that time. (*Id.*).

These are real consequences of his arrest and guilty plea in this case.

Ishan's friends and relatives have noted the dramatic change in Ishan's psychological state. Ishan's grandmother, Mohini Chopra, states in her letter that: "At a young age, he has learned a very hard lesson.  This has forever changed his world, he has lost his confidence, his peace of mind, and his capacity for joy and is greatly depressed. I can not have a conversation with him, without us both breaking down.  I have never seen him so distraught. He is seeking the help he needs to slowly mentally recover through therapy but there is a long road ahead to rebuild his life." (Chopra, 2).

Ishan's long-term girlfriend, Bianca Habib, notes the effect the case has had on him: "Ishan's trial in the court of public opinion has been particularly hard on him.  For nearly a year, Ishan has lived with anxiety, dread, regret, and emotional turmoil.  I see him in pain every day, reliving the events of the past year, to the point that he is unable to do normal, everyday things like watch TV, go to the gym, or even be able to sleep most nights.  For the last ten (10) months, Ishan has been living in a one-bedroom apartment, without the ability to be employed, freely travel, be with the people he cares about, or see his family (most recently, he was

prohibited from seeing his brother, and he now has no idea when he will get to see him next).  The little money that Ishan does have to support his day-to-day living has been continuously fraught with issues from banks closing his accounts, selling his personal belongings, canceling his apartment lease, relying on others for a place to live because he does not have enough to obtain a place of his own, to all his financial assets being frozen.  Reading this back, Ishan's life last year can be embodied by the idiom 'kick someone when they are down' and it has been heartbreaking to witness." (Habib, 4).  His friend, Sanjay Tourani, states: "I know that he [Ishan] deeply regrets what he has done and that he is committed to making amends." (Tourani, 1).

Ishan has taken steps to address his mental health issues.  Since December 2022, he has been receiving treatment from Dr. Kimberly MacEachern ██████ ████████████████████████████████████████.  Dr. MacEachern describes Ishan as an "engaged and motivated therapy patient" with a "a good prognosis for living with meaningful intention as a contributing member of society." (MacEachern, 1).

### G.    Ishan's mistake has put his relationship in jeopardy

In addition to all the collateral consequences Ishan has suffered, Ishan's relationship with Ms. Habib is now in extreme jeopardy due to his immigration status.  As a non-citizen, Ishan's conviction will result in him losing status and

becoming deportable.  Ms. Habib, a born-and-raised Texan with deep-rooted family and career ties to the area, is unable to move to India to be with Ishan.  This conviction may well bring an end to a relationship that resulted from a decade-long friendship.

For this relationship to continue to thrive, Ishan's path to staying in the US to be with Ms. Habib requires him to apply for a discretionary waiver of deportation, a process fraught with challenges, and highly dependent on the sentence that this court will impose.  At the conclusion of any term of incarceration, Ishan will be taken into immigration custody while he navigates the discretionary waiver process.  If Ishan is sentenced to a term of incarceration of a year or more, he will be ineligible for release,[5] and remain in ICE custody until either his waiver request is granted or until he is deported.  In that event, Ishan will likely spend several additional months in ICE custody during these proceedings due to the backlog in immigration courts. If the sentence was for less than a year, however, Ishan would not be subject to mandatory detention.  This risk to the future of Ishan's relationship with Ms. Habib is a particularly damaging and heart-breaking consequence for him.

---

[5] This is required by 8 U.S.C. § 1226(c)(1)(C).

## III.    THE ADVISORY GUIDELINES CALCULATIONS

### A.    The Plea Agreement and Plea

On February 7, 2023, Ishan plead guilty before this Court to two counts of conspiracy to commit wire fraud, under Counts One and Two of the Indictment. This plea was entered pursuant to a plea agreement under which Ishan and the government agreed to the following:

- The November 1, 2021, edition of the Guidelines Manual applies.

- Counts one and two are grouped pursuant to USSG § 3D1.2(d).

- The applicable guideline is USSG § 2B1.4 and the base offense level is 8, pursuant to USSG § 2B1.4(a).

- Pursuant to USSG §§ 2B1.4(b)(1) and 2B1.1(b)(1)(H), because the gain resulting from the offense amounted to between $550,000 and $1,500,000, 14 levels are added.

- Pursuant to USSG § 3B1.3 and Application Note #2 of § 2B1.4, because the defendant occupied and abused a position of special trust in a manner that significantly facilitated the commission or concealment of the offense, two levels are added.

- A three-level reduction for timely acceptance of responsibility is appropriate pursuant to §3E1.1(a) and (b), so long as Ishan continued to accept responsibility and appeared for sentencing.

16

- In accordance with the above, the applicable offense level is 21.

- The defendant has no criminal history points and a corresponding Criminal History Category of I.

- Based upon the above, the defendant's stipulated sentencing Guidelines range is 37 to 46 months' imprisonment and the applicable fine range is $15,000 to $150,000.

(PSR, ¶ 7 (a)-(i)). The Department of Probation has accepted the Guidelines calculations as set forth in the plea agreement. (PSR, ¶¶ 44-55, 99).

### B.  The Agreed-Upon Offense Conduct

As stated during Ishan's plea, and then again in his communications with Probation, Ishan does not contest any of the elements of the offense and has fully and freely admitted his culpability for these crimes.  In his own words, Ishan said:

"From July 2021 through May 2022, while I was an employee of Coinbase, I agreed to provide confidential business information that I obtained from my job to Sameer Ramani and Nikhil Wahi so that they could use that information to profit from trades in cryptocurrency tokens.  By virtue of my employment with Coinbase, I was aware of which new cryptocurrency tokens would be listed on the Coinbase platform and when they would be listed on the platform. After I learned that information, I informed Sameer Ramani and Nikhil Wahi of Coinbase's confidential plans to list selected tokens in advance of those listings.  While I did

17

not believe that any of the relevant cryptocurrency tokens were securities and relied on statements of Coinbase and others that the tokens traded on the Coinbase exchange were not securities, I knew that it was wrong to misappropriate and disseminate Coinbase's property so that others could use it to make trading decisions.  I also knew that Sameer Ramani and Nikhil Wahi would use the information I provided them to purchase those cryptocurrency tokens in advance of their listing on Coinbase and they in fact did so, using the internet to make those trades, and using wire transfers to buy and sell cryptocurrency tokens.  While I was unaware that Sameer Ramani would trade in the large volume that he did, I did receive a payment from him of approximately 10.97 ETH and 9440 USDT, representing a small portion of his profits from the cryptocurrency trades, and my personal gain from this conduct.

This is the worst decision I have taken in my life, and my family and I have paid for it dearly. I blame myself for the position that my brother and my family are in now.  Our family name has been shared and ridiculed worldwide; my brother is currently in prison—he has lost everything for which he has worked; and my parents and grandmother have spent a substantial portion of their life savings to pay for my legal fees—I owe them hundreds of thousands of dollars.  It has been over a year since I last saw them, and I don't know when I'll see them next. I

deeply regret my conduct and the consequences it has had for Coinbase, my former co-workers, and my family. I'm very sorry." (PSR, ¶¶ 42, 43).

## IV.  CONSIDERATION OF ALL THE PERTINENT SENTENCING FACTORS WARRANTS A NON-GUIDELINES SENTENCE

### A.  Applicable Sentencing Provisions

As noted above, Ishan entered into a plea agreement with the government and does not dispute the guideline calculation set forth in that plea agreement, which is the same as set forth in the Presentence Report. (ECF No. 85).  But this range is purely advisory. *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005).

Based on a total offense level of 21 and a criminal history category of I, the guidelines range is 37-46 months.  *See* PSR, ¶¶ 7(i), 99.  In fashioning a sentence that is "sufficient, but not greater than necessary" to comply with the purposes set forth in section 3553(a)(2), the Court should give due consideration to Ishan's remorse, the sentences of similarly-situated defendants in recent cases, and the other relevant mitigating factors discussed below.  We submit that when the additional relevant factors are properly considered, a non-guidelines sentence would be appropriate for Ishan.

### B.      The Gain Calculations Overweight the Gain as a Factor

As noted above, the gain amount attributed to Ishan drives the majority of the total offense level for the conduct at issue here, amounting to 14 of the 24 points assessed before the downward adjustment for acceptance of responsibility.

It has long been noted that the Guidelines' emphasis on loss (or gain, as in this case) can lead to unjust results.  At the United States Sentencing Commission Symposium on Economic Crime held at John Jay College in 2013 ("Symposium"), a plenary session was held solely to address the application of upward adjustments under USSG § 2B1.1.[6]  Your Honor was a member of that panel and made a number of relevant remarks about the connection between loss and sentences for economic crimes.  In discussing the then-recent sentencing of Joseph Collins, a lawyer convicted for his participation in the Refco scandal, Your Honor noted that the Guidelines analysis produced a result that was "absurd" (Symposium, 52), because it significantly overweighted the amount of the loss and the number of victims (*id.* at 51), and significantly underweighted the lack of significant gain by Collins from the scheme and the personal qualities of the defendant.  (*Id.* at 52).

---

[6] The transcript for that Symposium is available here: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/economic-crimes/20130918-19-symposium/Transcript-of-Symposium-on-Economic-Crime.pdf

While the Guidelines' calculations resulted in an offense level of 49 and a presumptive life sentence, Your Honor sentenced Collins to a year and a day. (*Id.*)

Your Honor was not alone in noting the possibility of a disconnect between Guidelines calculations and the culpability of an offense. As Judge Rakoff stated in *United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012), "[w]hereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results. Nowhere is this more obvious than in this very case, where the Sentencing Guidelines assign just 2 points to Mr. Gupta for his abuse of a position of trust—the very heart of his offense—yet assign him no fewer than 18 points for the resultant but unpredictable monetary gains made by others, from which Mr. Gupta did not in any direct sense receive one penny." *Id.* at 350. Similarly, in *United States v. Blaszczak*, Judge Kaplan found the application of the fraud Guidelines "troubling" where, as here, there was "no evidence that [the defendant] knew or had any control over the size of the trading or the potential gains that he was enabling people to make." Sentencing Tr. at 69-70, 17 Cr. 357 (LAK) (S.D.N.Y. Sept. 13, 2018). The same is largely true for Ishan: 14 points are assessed for monetary gain made by others, over which amounts Ishan had little knowledge and less control, whereas the conduct at the heart of the government's misappropriation theory is assessed at only 2 points.

21

Other judges have reached similar conclusions: "As far as this court can tell, the Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime." *United States v. Johnson*, No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018).  In 2004, then-District Judge Gerard Lynch called the loss enhancement a "questionable" aspect of the Guidelines, *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004), identifying numerous problems with centering loss in determining the appropriate sentencing range: the weakness of the correlation between loss and moral seriousness; the rigidity of the loss amount overriding the diverse reality of complex financial crimes; and the lack of any consideration of danger to society.  In a more recent case, the Second Circuit noted that a more rational regime might start with the seriousness of the typical fraud offense and de-emphasize the importance of loss, concluding that the Sentencing Guidelines focus on loss invited downward departures from sentencing judges. *See United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016); *see also United States v. Burghardt*, 702 F. App'x 4, 7 (2d Cir. 2017) (unpublished summary order) (cumulative effect of several significant sentencing enhancements warranted consideration of below guidelines sentence).

The Second circuit has also noted that the higher the loss (or gain as the case may be), the less reliable the guidelines are in assessing the appropriate punishment in fraud cases.  In *United States v. Corsey*, 723 F.3d 366, 376 (2d Cir. 2013), as corrected (July 24, 2013), the Second Circuit remanded sentences for reconsideration in light of the relevant Section 3553 factors even though the guidelines ranges (including very significant upward enhancements for loss) pushed the sentencing ranges well above a 20-year mandatory minimum.  In a concurrence discussed approvingly by Your Honor (Symposium, 56-57), after a thorough discussion of the history and merits of the sentencing guidelines' reliance on loss as the dominant factor in determining sentences, Judge Underhill, sitting by designation, noted that: "The history of bracket inflation directed by Congress renders the loss guideline fundamentally flawed, especially as loss amounts climb. The higher the loss amount, the more distorted is the guideline's advice to sentencing judges."  723 F.3d  at 380 (concurring).  Very recently, Your Honor observed during the sentencing of Ishan's brother Nikhil that "particularly at the higher levels, the fraud guidelines are more onerous than they need to be." ECF No. 69, 23:18-19.

The facts of Ishan's case highlight the unreliability of the Sentencing Guidelines tables for loss (or gain as in this case) as a measure of culpability.  The gain amount listed in the PSR attributes $550,000–$1,500,000 to Ishan, (*see* PSR, ¶

39), resulted in an upward adjustment of 14 levels.  This upward adjustment is correct under the Guidelines notwithstanding that Ishan's personal gain consisted of approximately 10.97 Ethereum tokens and 9,440 Tether tokens. [7]  *See* PSR, ¶¶ 7(k), 42, 113.  Ishan's part in the conspiracy ended when he communicated the confidential information he had learned about future Coinbase listings from his employer to his co-conspirators. Ishan had no control and little knowledge over the extent to which those co-conspirators traded on the information he provided them. As Judge Rakoff noted in *Gupta*, the heart of Ishan's offense, the misappropriation of confidential property, was distinct from the "resultant but unpredictable monetary gains made by others[.]" 904 F. Supp. 2d at 350.  Thus while the Guidelines unquestionably provide for an increase of 14 levels for this gain amount, the defense respectfully submits that this increase provides little helpful guidance in fashioning an appropriate sentence.

## C.   Section 3553(a) Factors Strongly Favor a Non-Guidelines Sentence

While the Guidelines range is the "'starting point and the initial benchmark' in calculating a sentence," *Kimbrough v. United States*, 552 U.S. 85, 108 (2007) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)), the Court must also consider the factors enumerated in 18 U.S.C. § 3553(a) in imposing sentence.  *See,*

---

[7] Today, those tokens are worth approximately $30,000, and Ishan has agreed to forfeit that property in its entirety. *See* PSR, ¶ 113.

*e.g.*, *United States v. Park*, 758 F.3d 193, 197 (2d Cir. 2014).  In short, the mechanistic approach of the Guidelines do not control sentencing outcomes, and district judges should exercise discretion in fitting sentences to a defendant's individual circumstances, *see United States v. Crosby*, 397 F.3d 103, 114 (2d Cir. 2005), giving "consideration [to] the judge's own sense of what is fair and a just sentence under all the circumstances." *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

As described in more detail below, in this case, the section 3553 factors strongly support a non-guidelines sentence.

Section 3553(a) states that:

> The court, in determining the particular sentence to be imposed, shall consider, (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed . . . ; (3) the kinds of sentences available; (4) [the Guidelines range]; (5) any pertinent policy statement; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

A court should impose a sentence "sufficient, but not greater than necessary":

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and

>   (D) to provide the defendant with needed educational or
>   vocational training, medical care, or other correctional treatment
>   in the most effective manner.

18 U.S.C. § 3553(a)(2); *see Dean v. United States*, 137 S. Ct. 1170, 1175 (2017).

Under the dictates of section 3553(a), "'necessary' is the operative word, for

section 3553(a) expressly dictates that '[t]he court shall impose a sentence

sufficient, *but not greater than necessary*,' to comply with the purposes set forth in

paragraph (2) of this subsection." *United States v. Adelson*, 441 F. Supp. 2d 506,

515 (S.D.N.Y. 2006).

### 1.    *Ishan's Personal Characteristics*

The first factors under 18 U.S.C. § 3553 are "the nature and circumstances

of the offense and the history and characteristics of the defendant." 18 U.S.C. §

3553(a)(1). At every stage of his life, school, and employment, Ishan has

demonstrated his extraordinary devotion to and concern for others. As recognized

by Judge Rakoff in *United States v. Adelson,* 441 F. Supp. 2d 506 (S.D.N.Y.

2006): "[S]urely, if ever a man is to receive credit for the good he has done, and his

immediate misconduct assessed in the context of his overall life hitherto, it should

be at the moment of his sentencing, when his very future hangs in the balance.

This elementary principle of weighing the good with the bad, which is basic to all

the great religions, moral philosophies, and systems of justice, was plainly part of

what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics' of the defendant." *Id.* at 514.

As described in the many letters in support submitted with this memo, up until the offense conduct charged here, Ishan lived a life that was exemplary. Ishan served as a mentor and ally for many friends and relatives, helping to guide them through the most difficult moments in their lives. He devoted considerable parts of his young life to charity. He has throughout demonstrated an open and giving heart.

As documented by the letters submitted herewith, Ishan has been a lifelong mentor and guide to his colleagues and younger relations by:

- Tutoring his cousin Ananya Kapoor in math and guiding her through her college applications (Kapoor, 2);

- Doing the same for the son of family Nandita Saxena (Saxena, 1);

- Helping his aunt Nathasha Minocha start a new business and launch a website a few years later (Minocha, 1);

- Helping his grandmother Mohinia Chopra re-learn how to drive and use technology to stay in touch with friends and family during COVID-19 pandemic (Minocha 1-2);

- Mentoring his fellow students at the University of Texas (Sharma, 1);

27

- Walking a colleague at PayPal through a difficult assignment at her job (Srinidhi, 1); and

- Helping his fellow international students orient and integrate at Carnegie Mellon (Reutler 1) and obtain jobs after graduation (Reutler, 2).

Throughout his life, Ishan has been exceptionally generous, a few of which examples are given here:

- Giving up the use of his car for months so a friend could try to find a job (Shantu Jain 1);

- Buying a laptop for a fellow student and letting him live rent-free (Tourani, 1); and

- Helping a man, who was short a few dollars, buy a meal at a Whataburger in Houston (Habib, 2).

Throughout his life, Ishan has maintained a deep and continuous commitment to charity and helping others.  This is evidenced by, among other things:

- Ishan's work for the "Nine is mine" campaign in high school (Endlaw, 1);

- His attempt to launch the "Round Up" feature at PayPal, which would have allowed for frictionless savings by PayPal users (Sahil Jain, 1);

- Volunteering at animal shelters (Sharma, 1);

- Volunteering at a community college teaching Mathematics and English to ESL and GED students (Habib, 3); and

- His work for TheTeacherApp from 2016 to 2018, a not-for-profit dedicated to helping teachers in India become more effective educators for that country's approximately 250 million schoolchildren, at considerable cost and no small risk to himself (Karate, 1) (Khurana, 1).

Ishan's life has had an unblemished record that has been marked by acts of kindness and giving. These actions are an isolated mistake in the context of Ishan's entire life. *See U.S. v. Howe*, 543 F.3d 128 (3d Cir. 2008) (district court did not clearly err in deeming the offense—characterized by the government as a two-year campaign to cover up a six-figure fraud on the Air Force—an "isolated mistake" in the context of Howe's entire life, which was otherwise upstanding and included military service, devotion to family, community, and church).  Most people with Ishan's background aspire to leave India and come to the United States in hopes of a more financially rewarding career and a better life.  It is very rare that someone does the opposite, *i.e.*, after establishing themselves in a secure, rewarding career path, leave to go work in a developing country for a fraction of their salary.

Ishan's work with TheTeacherApp, helping millions of teachers and students and improving the educational outcomes in a country that desperately needs it (while traveling to and working in some of the most dangerous parts of the country), deserves serious consideration while crafting a sentence.

Courts have found similar histories of charitable actions and good character to justify sentences below the relevant guidelines ranges.  *See United States v. DiMattina,* 885 F. Supp. 2d 572, 582 (E.D.N.Y. 2012) ("good character and many acts of charity" justified reduction); *see also United States v. Canova,* 412 F.3d 331, 358-59 (2d Cir. 2005) (affirming six-level downward departure based on extraordinary public service and good works); *United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996) (affirming district court's consideration of charitable works as appropriate basis for Guidelines departure); *United States v. Tomko*, 562 F.3d 558, 572 (3d Cir. 2009) (*en banc*) (affirming below-Guidelines variance based, in part, on defendant's character and good works).  These good works are not simply the making of donations to good causes by an already wealthy individual nor are they opportunistic, post-arrest, acts of a person working to avoid a stiff sentence: as demonstrated by the numerous letters in support submitted herewith these are acts of a lifetime in which Ishan, with no expectation of any reward, has given freely of his time, his money, and his property to his friends, relatives, and colleagues and

has made significant contributions to some of the world's neediest, at no small cost to himself.

Another factor the Court may properly consider is Ishan's age. In *United States v. Gomez*, Judge Sweet found that the defendant's younger age, at the age of 31, was a significant factor in justifying the court's variance from the sentencing Guidelines. *See* 11-cr-96 (RWS), 2013 U.S. Dist. LEXIS 30219, at *14 (S.D.N.Y. Feb. 27, 2013). Ishan, at the age of 32, is similarly situated. *See* PSR, at p.3. Numerous other cases in this District have countenanced Guidelines variances for younger defendants. *See, e.g., United States v. Allen*, 644 F. Supp. 2d 422, 437 (S.D.N.Y. 2009) (opining that though a non-guidelines sentence is not always appropriate, "the youth of the defendants at the time of the relevant conduct" weighs in favor of a variance from the Guidelines); *United States v. Rosario*, 12-cr-403 (RWS), 2012 U.S. Dist. LEXIS 135695 at *13 (S.D.N.Y. Sep. 19, 2012) (variance from Guidelines warranted "in light of the defendant's youth.")

### 2. *Ishan Has Accepted Responsibility*

Ishan's acceptance of responsibility has been swift, sincere, and complete. *See* PSR, ¶¶ 41-43. Like his brother, immediately following his arrest Ishan worked quickly to resolve this matter and thereby mitigated the use of prosecutorial resources in his case to the best of his ability. Further, there have been no allegations that Ishan was uncooperative or attempted to impede the

government's investigation. *See* PSR, ¶ 40 (noting that "the probation officer has no information indicating the defendant impeded or obstructed justice.").

As the PSR and the many letters submitted on his behalf, by his mother, Kavita Wahi, by his girlfriend, Bianca Habib, and many others, Ishan's criminal conduct has been the regret of his lifetime.

### 3.     *Nature and Circumstances of the Offense; Need for Sentence to Reflect the Seriousness of the Offense*

Section 3553(a)(1) requires the Court to consider "the nature and circumstances of the offense," while Section 3553(a)(2)(A) requires the Court to impose a sentence "sufficient, but not greater than necessary . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."

Ishan has acknowledged his wrongful participation in a conspiracy with his co-defendants to misappropriate Coinbase's property.  Ishan also acknowledges that his actions were unfair to those who did not trade on the basis of the non-public information he was entrusted with, and that his conduct undermined the public's confidence in the cryptocurrency markets.

Although Ishan's conduct was undoubtedly serious, a non-guidelines sentence is nonetheless "sufficient, but not greater than necessary" to reflect the seriousness of the offense. Accordingly, a sentence of 37-46 months is far beyond what is required here.

32

### 4.     Need for Sentence to Provide Specific Deterrence

Section 3553(a)(2)(C) requires the Court to take into consideration the need "to protect the public from further crimes of the defendant." Respectfully, Ishan poses no threat of recidivism. There is no doubt that Ishan has felt punishment as the result of his missteps.

First, Ishan spent a year enduring the stress of the government's investigation and subsequent prosecution to the point he has been ███████████ ████████████████████████. He has been unemployed since his arrest, and has lost a prestigious job at a burgeoning tech company (and with it, the career prospects he cultivated over a decade of schooling and employment in the United States). Further, Ishan has depleted not only his personal savings in the course of his defense, but also that of his parents and grandparents (whom he now owes hundreds of thousands of dollars). But far worse than any financial strain is the immense personal shame that accompanied Ishan's felony convictions and watching his family suffer as a direct result of his actions. His family name has been ridiculed across the globe; he has watched his brother go to prison; and he is uncertain as to when he might see his relatives next. Each one of these consequences alone would be enough to deter Ishan from committing any further crimes, but together, they all but ensure it.

In short, the past year has been torturous for Ishan.  He wants nothing more than to put this chapter of his life behind him so he can devote his full time and energy to his family and his health.  While he may never again be able to work in the finance, cryptocurrency, and technology industries, Ishan is ready to face the challenge of finding a new way to provide for his loved ones.  As this Court noted with regard to Ishan's brother, "there is no need for a lengthier period of incarceration to keep the public safe from crimes of this defendant."  ECF No. 69, 24:15-17.  There is no reason to reach a different conclusion here.  Accordingly, a non-guidelines sentence is more than a sufficient deterrent.

Further, publications by the U.S. Sentencing Commission confirm that "first offenders" like Ishan, with no prior convictions or arrests, have an "extremely low recidivism rate."[8] The U.S. Sentencing Commission has also reported that defendants convicted of fraud-related crimes are less likely to recidivate than defendants convicted of any other crimes.[9]

---

[8] United States Sentencing Commission, Recidivism And The "First Offender" (May 2004), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/researchpublications/2004/200405_Recidivism_First_Offender.pdf, at page 17 (reporting a 6.8% recidivism rate for true first time offenders). This study notably does not differentiate between different types of crime even though defendants convicted of fraud are the least likely to recidivate.

[9] United States Sentencing Commission, Recidivism Among Federal Offenders: A Comprehensive Overview (March 2016), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/researchpublications/2016/recidivism_overview.pdf, at 20.

### 5.    *Need for Sentence to Provide General Deterrence*

Section 3553(a)(2)(C) requires the Court to take into consideration the need to "afford adequate deterrence to criminal conduct," often viewed as the need to provide general deterrence.  This factor does not require a lengthy term of imprisonment for Ishan.

The punishment that Ishan has endured thus far is more than sufficient to deter others who work in the cryptocurrency industry from engaging in similar conduct.  Ishan's reputation has been destroyed.  He will forever be branded a felon, and may not be able to work in the industry in which he spent years painstakingly building his career.  *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("[T]he need for further deterrence and protection of the public is lessened because the conviction itself 'already visits substantial punishment on the defendant.'"); *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993), *aff'd*, 31 F.3d 73 (2d Cir. 1994) ("Elimination of the defendant's ability to engage in similar or related activities – or indeed any major business activity – for some time, and the substantial loss of assets and income resulting from this . . . constitutes a source of both individual and general deterrence.").  In light of these significant consequences, combined with the prospect of deportation and the anticipated restitution and forfeiture orders, it is hard to imagine that someone would want to risk landing in Ishan's shoes.

While not to say Ishan's conduct does not merit punishment, we note that general deterrence has also been served with the conviction and sentence that resulted from Ishan's brother's plea.  In sentencing Ishan's brother, Nikhil, this Court noted that "there is a need here for public deterrence … insider trading is fraud, plain and simple."  *United States v. Wahi*, 22-cr-392 (S.D.N.Y. 2023), ECF No. 69, 24:17-19.  As a result, Nikhil Wahi received a sentence of imprisonment along with significant fines, forfeiture orders, and/or restitution orders.  Indeed, Nikhil Wahi's sentence has not gone unnoticed; in fact, it has been publicized as the first of its kind in the cryptocurrency space.[10]  Thus, Ishan's guilty plea, along with Nikhil Wahi's guilty plea and subsequent imprisonment, have already sent a powerful message of deterrence to the public.  Accordingly, no greater a sentence than that imposed on Nikhil Wahi need be imposed on Ishan Wahi to provide general deterrence. *See United States v. Velazquez*, No. 16-CR-233 (AKH), 2017 WL 2782037, *4 (S.D.N.Y. May 26, 2017) ("Current empirical research on general deterrence shows that while certainty of punishment has a deterrent effect, 'increases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence.'") (citation omitted). This is

---

[10] *See, e.g.,* Gizmodo, *Crypto Gets Its First Prison Sentence for Insider Trading*, January 10, 2023 https://gizmodo.com/coinbase-crypto-insider-trading-sentence-bitcoin-price-1849971685

especially true with white-collar offenders. See, Richard A. Frase, A More Perfect System: Twenty-five Years of Guidelines Sentencing Reform (Punishment Purposes), 58 STAN. L. REV. 67, 80 (2005). Thus, there is no empirical reason to believe that an extended period of incarceration for Ishan will provide more effective general deterrence.

Almost every American newspaper, from the Wall Street Journal to The New York Times, every major global newspaper, and most 24-hour news outlets, including CNN, have reported on this case with great interest and detail.  As the first-ever "insider trading" criminal case in cryptocurrency, every significant moment of this case has been reported exhaustively and in real-time.  The global media has done this Court's job of deterring any would-be tippers of inside information regarding crypto-assets, and the government's own, extensively-reported, statements should have extinguished any hypothetical appetite of the general public to engage in the same criminal conduct as Ishan.[11]  Thus, we

---

[11] https://www.justice.gov/usao-sdny/pr/former-coinbase-insider-pleads-guilty-first-ever-cryptocurrency-insider-trading-case (U.S. Attorney Damian Williams said: "Ishan Wahi – a former Coinbase product manager – admitted in court today that he tipped others regarding Coinbase's planned token listings so that they could trade in crypto assets for a profit.  Wahi is the first insider to admit guilt in an insider trading case involving the cryptocurrency markets.  Whether it occurs in the equity markets or the crypto markets, stealing confidential business information for your own personal profit or the profit of others is a serious federal crime.  The Southern District of New York has decades of experience pursuing insider trading cases, and we will continue to use our expertise to prosecute this crime no matter

respectfully submit that the goals of general deterrence have already been achieved and that excessive prison time will not advance those goals.  As noted above, scholars have consistently concluded that it is the certainty of punishment, rather than its severity, that is the most effective deterrent for financial crimes.

### 6.      Need to Provide the Defendant with Medical Care in the Most Effective Manner

Judge Rakoff has opined that "an important part of any just sentence is to try to do the best to preserve the defendant's own role in adjusting to becoming a responsible citizen." *United States v. Pinto-Thomaz*, 18-cr-579 (JSR), (S.D.N.Y. 2019), ECF No. 154, 43:6 – 43:9.  In that spirit, section 3553(a)(2)(C) requires the Court to take into consideration the need to "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

Based on the current practices of the Bureau of Prisons, is unlikely that Ishan would be able to receive the same mental health treatment that his current psychologist has provided for him.  The Bureau of Prisons mental health services "vary from institution to institution and from mental health professional to mental health professional, [and] generally speaking mental health treatment in the Bureau

---

what form it takes and where it occurs.").  Ishan's guilty plea was reported in, among many other outlets, the Wall Street Journal, the New York Times, Reuters, Blockchain News, Coindesk, Decrypt, Gizmodo and Engadget.

of Prisons is designed to enable the inmate to function within the prison system, for example, not a danger to self, staff or other inmates … rarely will an inmate receive any meaningful treatment for underlying disorders such as PTSD…"  Alan Ellis and Mark Allenbaugh, *Mental Health Care in the Bureau of Prisons*, The National Trial Lawyers, Apr. 13, 2017, at 1-2.

Ishan is working every day to manage and overcome his ███████████ ███████████.  *See* PSR, ¶ 76.  Severing his relationship with an appropriate psychologist for an extensive period of time would not serve to provide him with "the most effective manner" of treatment.  Thus, while Ishan does not believe that he is entitled to leniency simply because he struggles with mental health issues, he respectfully asks the Court to consider the effectiveness of his current treatment plan and the very real risk of a setback that will accompany a lengthy custodial sentence.

### 7.    *Need to Avoid Unwarranted Sentencing Disparities*

Section 3553(a)(6) provides that "the court shall consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  To begin, the probation office has provided data—re-created in the chart below—regarding sentence length for the fiscal years 2017-2021 in cases where, as here: (1) the primary guideline was § 2B1.4; (2) the defendant had an offense level of 21; and (3) the defendant had a

Criminal History Category of I (excluding §5K1.1 cases).  Of the eight similarly-situated defendants in such cases, two defendants received a non-incarceratory sentence.  The average sentence in these cases was 14 months, and the median sentence was 12 months. *See* PSR, at pp. 28-29.



Even excluding from the calculation those defendants who were given a non-incarceratory sentence, the average length of imprisonment was 15 months (the sentence sought here) and the median length of imprisonment was 12 months.  *See id.*  No matter how you slice it, these figures describe imposed sentences that are well below Ishan's Guidelines range.  Thus, a non-guidelines sentence of 10

months, just slightly below the median, would avoid unwarranted disparities among Ishan's defendant-peers.[12]

And recent insider trading cases with similarly-situated defendants in this District have resulted in sentences well below the lower bound of Ishan's Guidelines range.  For example, in *United States v. Pinto-Thomaz*, the court was tasked with sentencing a Standard & Poors employee after the employee, Mr. Pinto-Thomaz, forwarded confidential information regarding a business acquisition to his friends so that his friends could trade on that information.  *See United States v. Pinto-Thomaz*, 18-cr-00579 (JSR) (S.D.N.Y. 2018), ECF No. 1.  Mr. Pinto-Thomaz was convicted at trial, and his recommended Guidelines range was 41-51 months—higher than the range here. *See United States v. Pinto-Thomaz*, 18-cr-00579 (JSR) (S.D.N.Y. 2018), ECF No. 154, 31:21 - 32:6.  But ultimately, Judge Rakoff sentenced the defendant to 14 months incarceration. *See id.*, ECF No. 154, 44:3 - 44:7.

Similarly, in 2019, Benjamin Chow was sentenced to a three-month period of incarceration following a conviction at trial[13] for eight counts of securities fraud

---

[12] A 2011 Reuters article noted that in 2009 and 2010, judges in the Southern District of New York imposed below Guidelines sentences in 87% of insider trading cases. *See* https://www.reuters.com/article/us-insider-trading/why-u-s-inside-traders-escape-harsh-sentences-idUSTRE7055JP20110106

[13] Notably, both Mr. Chow and Mr. Pinto-Thomaz opted to go to trial, whereas Ishan's guilty plea has spared the government's resources.

and conspiracy to commit securities fraud. *See United States v. Chow*, 17-cr-667 (GHW) (S.D.N.Y 2017), ECF No. 157.  Mr. Chow's criminal offense level was 26, carrying with it an advisory Guidelines range of 63–78 months imprisonment. *United States v. Chow*, 17-cr-667 (GHW) (S.D.N.Y 2017), ECF No. 161, 40:11-13.  In considering Mr. Chow's sentence, the court noted that the defendant "[did] not seem to have been motivated by greed or desire to aggrandize himself, the kind of toxic motivations that one frequently sees." *United States v. Chow*, 17-cr-667 (GHW) (S.D.N.Y 2017), ECF No. 161, 74:16-20.  The same is true here.  Ishan's conduct, while wrongful, was not intended to benefit himself primarily but was motivated mostly to help his brother and his friend.

In *United States v. Jung*, Woojae Jung was sentenced to three months imprisonment for operating an insider trading scheme over the course of two years, in which Jung tipped his brother on numerous occasions as to material non-public information that Jung acquired through his employment at Goldman Sachs. *See United States v. Jung*, 18-cr-518 (LAK) (S.D.N.Y. 2019), ECF No. 54, at 2; *United States v. Jung*, 18-cr-518 (LAK) (S.D.N.Y. 2019), ECF No. 50, at 10.

Notably, in *United States v. Pickens*, 05-cr-793 (LAP) (S.D.N.Y. 2007), Your Honor sentenced the defendant to probation after the defendant had pled guilty to three counts of securities fraud, with losses totaling approximately $1.2 million.  *Id.*, ECF No. 27 at 2.  And in *United States v. Peltz*, 21-cr-154 (E.D.N.Y

42

2023), in the Eastern District of New York, the defendant was charged with securities and tax fraud with over $1 million in loss, a guidelines range of 37 to 46 months, and Judge Garaufis sentenced him to probation. *Id.*, ECF 70.

Nor are these cases outliers in the District. Fraud cases in this District have frequently resulted in sentences substantially below the Guidelines range. The national average sentence in 2019 for fraud cases was 21 months, and in the S.D.N.Y., it was 19 months. The median sentences in both were 12 months. Significantly, 54.2% of fraud cases in the Second Circuit received a variance from the Guidelines at sentencing, and only 26.2% of fraud cases in the Second Circuit received a guideline sentence. In 2020, the national mean sentence in fraud cases was 19 months, and the median was 8 months; the Second Circuit mean was 19 months, and the median was 12 months. And in 2020, 59.2% of fraud cases in this Circuit received a downward variance. In 2021, the national average sentence for fraud cases was 20 months, and in the S.D.N.Y., it was also 20 months. The median sentence in both was 12 months. In 2021, 66.3% of fraud cases in the S.D.N.Y received a downward variance.[14]

---

[14] The United States Sentencing Commission Statistical Information Packet for FY 2019, 2020, and 2021 are attached hereto as Exh. 17, 18, and 19. The delta between "Guidelines sentences" in the Second Circuit for fraud being 26.2% and the sentences in which "downward variances" where granted being 54.2% is explained by the fact that the Commission does not consider cases in which downward *departures* were granted (19.6% with most being under USSG § 5K1.1)

*Pinto-Thomaz*, *Chow*, *Jung*, *Pickens¸* and *Peltz* are just a few recent examples that are illustrative of a sea-change in federal sentencing practices.  In fact, On April 5, 2023, the U.S. Sentencing Commission voted unanimously to include a new Guideline, § 4C1.1, and to amend the existing §5C1.1, which covers the imposition of terms of imprisonment. [15]  Noting that "[r]ecidivism data analyzed by the Commission suggest that offenders with zero criminal history points have considerably lower recidivism rates than other offenders," the U.S. Sentencing Commission will implement USSG § 4C1.1, which will provide a decrease of two levels from the offense level determined under Guidelines Chapters Two and Three if the defendant meets certain criteria.  *Id.*  Critically, the Commission will advise, beginning in November 2023, that a non-incarceratory sentence may be appropriate for first-time offenders with no criminal history points who qualify for an adjustment under USSG § 4C1.1, even where their applicable Guidelines range is in Zone C or Zone D, if "the applicable [G]uideline range

---

to be "Guidelines" sentences. *See, e.g.*, United States Sentencing Commission Statistical Information Packet for FY 2019 at 16.

[15] U.S. Sentencing Commission, *Amendments to the Sentencing Guidelines (Preliminary),* April 5, 2023, https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20230405_prelim-RF.pdf

overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense." *Id.*[16]

Finally, unlike citizen-defendants charged with similar crimes, as noted above, Ishan is very likely to be deported as a result of his conviction in this case. The Supreme Court has held that deportation is a penalty that flows from a conviction in a criminal case, indeed, "sometimes the most important part—of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes." *See Padilla v. Kentucky*, 559 U.S. 356, 366 (2010); *see also United States v. Gonzales*, 884 F.3d 457, 462 (2d Cir. 2018) (same). For this reason, a court may consider a defendant's deportation as a consequence of conviction in crafting an appropriate sentence. *See United States v. Bello-Gobea*, No. 12 CR 114-01 RWS, 2013 WL 5512829, at *4 (S.D.N.Y. Oct. 4, 2013).[17]

Indeed, non-citizen defendants also suffer consequences in Bureau of Prisons custody that citizen defendants do not. Ordinarily, a non-violent, first-time offender would be eligible to be assigned to a minimum-security prison "camp." Because Ishan has an immigration detainer, he would be ineligible for such an assignment. While Ishan is eligible for certain programs in the Bureau of Prisons,

---

[16] Application of USSG § 4C1.1 to Ishan's case could warrant a sentence of even less than 10 months. Ishan does not seek that here, however, given the apparent unfairness of seeking a sentence below his brother's.

[17] For the same reason, it is respectfully requested that the Court impose no term of supervised release. PSR, ¶ 104; USSG § 5D1.1(c).

he is ineligible for programs that allow for early release.  A court may consider these factors in imposing sentence. *See United States v. Navarro-Diaz*, 420 F.3d 581, 588 (6th Cir. 2005) (court of appeals held  that district court could consider that defendant would be punished more than a citizen due to ineligibility for six months halfway house at end of term).

Accordingly, we respectfully submit that a below Guidelines sentence for Ishan is not only appropriate, but necessary, in order to avoid unwarranted sentencing disparities.  *See* 18 U.S.C. § 3553(a)(6).

## V.    CONCLUSION

For the foregoing reasons, Ishan respectfully requests that the Court impose

a non-guidelines sentence of no more than 10 months incarceration.


Dated:          New York, New York          Respectfully submitted,
                April 25, 2023
                                            GREENBERG TRAURIG, LLP

                                            By:  /s/ David I. Miller
                                            David I. Miller
                                            Charles J. Berk
                                            One Vanderbilt Avenue
                                            New York, New York 10017
                                            T: (212) 801-9200
                                            F: (212) 801-6400
                                            David.Miller@gtlaw.com
                                            Berkc@Gtlaw.com

                                            Andrew St. Laurent
                                            Harris St. Laurent & Wechsler LLP
                                            40 Wall Street
                                            New York, NY 10005
                                            (212) 397-3370
                                            Andrew@hs-law.com
                                            *Attorneys for Ishan Wahi*