UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
                                  :

UNITED STATES OF AMERICA      :

                                  :     22 Cr. 392 (LAP)

           -  v.  -        :

                                  :

ISHAN WAHI,                   :

                                  :

                   Defendant.   :

                                  :

------------------------------------------------------x

## THE GOVERNMENT'S SENTENCING MEMORANDUM

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Noah Solowiejczyk
Nicolas Roos
Assistant United States Attorneys
    - *Of Counsel* -

## PRELIMINARY STATEMENT

The Government respectfully submits this sentencing memorandum in advance of the sentencing of Ishan Wahi scheduled for May 9, 2023.

Ishan Wahi, a product manager at Coinbase Global Inc. ("Coinbase"), misappropriated Coinbase's confidential business information regarding its impending token listings and tipped his brother, Nikhil Wahi, and his friend, Sameer Ramani, so that they could profitably trade in numerous crypto tokens based on this information.   This crime was not the result of an isolated error in judgment.   Rather, the defendant participated in a long-running criminal scheme that spanned approximately 10 months and chose to tip his associates based on Coinbase confidential information time and time again.   In total, based on the Coinbase confidential information provided by Ishan Wahi, Nikhil Wahi and Ramani traded in at least approximately 55 different crypto tokens and generated nearly $1.5 million in profits.

The defendant was not any ordinary Coinbase employee.   As a result of his role as a product manager on one of Coinbase's asset listing teams, he had routine access to sensitive, confidential business information regarding Coinbase's planned token listings.   This information was valuable and frequently moved crypto token prices.   Coinbase's policies were clear that tipping others on such information was strictly prohibited.   Rather than closely guard Coinbase's corporate secrets as he had promised that he would, the defendant instead chose to exploit his sensitive role.   He breached the trust that was placed in him by Coinbase by tipping his brother and his friend so that they could turn a profit.

While the defendant suggests that a sentence of no more than 10 months' imprisonment – a sentence identical to the sentence this Court imposed on co-defendant Nikhil Wahi – would be sufficient, the Government respectfully submits that such a sentence would not fully vindicate all of the section 3553(a) factors.   As is discussed in further detail below, a sentence of 10 months'

1

imprisonment would be inadequate because it would, among other things, lead to unwarranted sentencing disparities due to the fact that the defendant's offense conduct is more serious than his brother's, would fail to fully reflect the seriousness of the offense conduct, and would inadequately promote general deterrence.

In light of the seriousness of the offense conduct, the goals of sentencing – particularly just punishment, promotion of respect for the law, and adequate deterrence – will be served by a term of imprisonment within the advisory Guidelines range of 37 to 46 months' imprisonment. Such a sentence is sufficient but not greater than necessary to serve the legitimate ends of sentencing.

## STATEMENT OF FACTS

From in or about June 2021 through in or about April 2022, Ishan Wahi, the defendant, tipped his brother (Nikhil Wahi), and Sameer Ramani regarding which crypto assets Coinbase was planning to list and the timing of public announcements of those listings.   The defendant tipped his co-defendants so that they could make well-timed purchases of crypto assets in advance of Coinbase's listing announcements.   (PSR ¶ 12).   After Coinbase's listing decisions became public, and after the crypto assets appreciated due to that announcement, the defendant's co-conspirators caused the sale of those crypto assets for substantial profits.   (PSR ¶ 12).   The Government's investigation to date has revealed that the defendant, in total, tipped his co-defendants as to at least 55 different crypto assets based on confidential information regarding impending Coinbase listing announcements.   Based on the tips from the defendant, Nikhil Wahi and Ramani generated total profits of nearly $1.5 million from their trading.[1]

---

[1] The statement of facts is based on the facts contained in the PSR, the allegations in the Indictment, as well as information that the Government learned subsequent to the filing of the Indictment. The information learned by the Government subsequent to the defendant's guilty plea is contained in an affidavit filed in support of the issuance of seizure warrants pursuant to 18 U.S.C. § 981 and 984 (the "Seizure Affidavit").   A copy of the Seizure Affidavit is annexed hereto as Exhibit A.

*Background on Coinbase and Coinbase Listing Announcements*

Coinbase is one of the largest cryptocurrency exchanges in the world.   Coinbase allows users to acquire, exchange, and sell various crypto assets in online user accounts.   In order to transact in a particular crypto asset on Coinbase, that crypto asset must be listed on Coinbase's exchanges.   Coinbase frequently announces that particular crypto assets will be listed on one of its exchanges or are under consideration for listing.   Coinbase often makes these announcements on Coinbase's publicly available blog or Twitter account.   It is well known to market participants that after Coinbase announces that it is going to be listing or is considering listing a particular crypto asset, the market value of that crypto asset typically rises substantially.   (PSR ¶ 16).

Coinbase takes steps to guard the confidentiality of information regarding prospective asset listings and to ensure that potential traders do not learn of prospective listings before the company announced them formally to the general public. The company's policies and agreements thus prohibit employees from using confidential information about asset listings, including which crypto assets Coinbase intends to list on its exchanges, except for the benefit of Coinbase.   Indeed, Coinbase's policies make clear that employees "helping to implement support of [a] new asset" are prohibited from "buy[ing] the new asset" in advance of an announcement.   Coinbase's written policies also prohibit employees from disclosing the confidential information to any person outside of Coinbase, including "family or friends," and expressly bar employees from providing a "tip" to any person who might make a trading decision based on the information.   (PSR ¶ 17).

*Ishan Wahi's Role at Coinbase*

Beginning in October 2020, the defendant was employed by Coinbase as a product manager assigned to an asset listing team.   Pursuant to the policies described above, and by virtue of his employment more generally, the defendant was prohibited from sharing confidential business information about Coinbase's asset listings with others and from using that information

other than for the benefit of his employer.   Moreover, as a member of Coinbase's asset listing team, the defendant was subject to an "enhanced trading policy" that, among other things, required him to report his digital asset holdings and seek preclearance for any digital asset trades conducted by Ishan Wahi outside of Coinbase's platform.   During the course of his employment at Coinbase, the defendant provided Coinbase with a written certification that he had read the company's trading and confidentiality policies, that he understood them, and that he would comply with them.   (PSR ¶ 18).

As a product manager on one of Coinbase's asset listing teams, the defendant frequently had advance knowledge of which crypto assets Coinbase planned to announce it was listing or considering listing, and had advanced knowledge of the timing of those announcements.   Indeed, beginning at least in or about August 2021 and continuing until at least in or about May 2022, the defendant was a member of a private messaging channel reserved for a small number of Coinbase employees with direct involvement in the Coinbase asset listing process.   Upon joining the channel, the defendant was informed by another Coinbase employee that its purpose was to provide a "safe place to discuss details around asset launches" such as "exact announcement / launch dates + timelines" that the company did not wish to share with all of its employees.   (PSR ¶ 19).

The defendant also well understood that he was not permitted to tip others using the confidential Coinbase business information that he had access to. Indeed, the defendant was expressly informed in the Coinbase internal messaging channel that he was a member of that "anyone in this channel and anyone invited to this channel must be on the Enhanced Trading Policy (Covered Persons) as the information discussed here is MNPI [material non-public information]." Moreover, the defendant was trained on Coinbase's policies and the possible consequences of misappropriating Coinbase's confidential business information, including by tipping others with such information. Coinbase trained the defendant on the fact that material non-public information

included "pending exploration of listing or decision to list/not list on Coinbase" and that the "consequences of violating the insider trading laws can be severe" and could include, among other things, "pay[ing] a criminal penalty of up to $5 million for individuals . . . . and serv[ing] **a prison term of up to 20 years**." (CB_IW_000000447) (emphasis in original).

In connection with the scheme, the defendant sought to deceive Coinbase and his fellow employees by assuring them – through, among other means, Coinbase's private asset listing messaging channel – that he was maintaining the confidentiality of this information.   In truth and in fact, however, the defendant repeatedly breached his duty of confidentiality to Coinbase by misappropriating Coinbase's confidential information and providing it to (1) his brother, co-defendant Nikhil Wahi, and (2) Ishan Wahi's friend and associate, co-defendant Sameer Ramani, so that they could each make profitable trades on the basis of that confidential information.   (PSR ¶ 20).

*Nikhil Wahi's and Ramani's Extensive Trading Based on the Defendant's Tips*

The defendant's co-conspirators traded extensively based on the Coinbase confidential business information provided to them by the defendant.   Based on the Government's investigation, it appears that the defendant began misappropriating Coinbase confidential information as early as June 2021.   Between that date and at least approximately late April 2022, the defendant's co-conspirators purchased at least approximately 55 different crypto assets shortly before Coinbase announced it would be listing these crypto assets on its exchanges, and then subsequently sold these assets for substantial profits.

The defendant's co-conspirators' initial trades were for modest sums.   But, over time, the principal that Ramani and Nikhil Wahi used to purchase the crypto assets based on information misappropriated by the defendant, and the profits that they realized from selling them escalated substantially.   For example, Ramani spent principal of only approximately $20,000 in connection

with purchases in advance of Coinbase's announcement that it was listing a particular token on June 15, 2021, and generated modest profits by selling after the Coinbase listing announcement. By April 2022 Ramani's trading had escalated substantially.   In advance of the April 11, 2022 announcement by Coinbase that certain crypto assets were under consideration for listing, Ramani spent principal of approximately $370,000 and then, following the Coinbase public announcement on April 11, the crypto tokens purchased by Ramani quickly appreciated by over at least $195,000. (Indictment ¶ 13(h)).   Similarly, whereas in August 2021 Nikhil Wahi purchased approximately $60,000 worth of the crypto asset TRIBE prior to the Coinbase listing announcement, and sold these TRIBE tokens for a profit of approximately $7,000 shortly after the Coinbase listing announcement (PSR ¶¶ 23), by the spring of 2022 Nikhil Wahi was regularly putting up hundreds of thousands of dollars in principal to purchase crypto assets and then selling these assets after Coinbase listing announcements for tens of thousands of dollars in profits. (*See* Seizure Affidavit ¶¶ 28(f)-(h); 30(c)(xv)-(xviii)).

*Efforts to Avoid Detection*

The defendant and his co-conspirators also took numerous steps to evade detection from law enforcement.   Throughout the scheme, the defendant's co-conspirators attempted to conceal their trading by transferring his crypto assets through a web of crypto accounts and anonymous Ethereum blockchain wallets, including through accounts registered in the names of other nominal owners and under pseudonym email accounts.   (PSR ¶ 15).   Frequently, the anonymous Ethereum wallets that the defendant's co-conspirators used to place trades and move proceeds had no prior balances or transactional history.   (*See, e.g.,* Seizure Affidavit ¶¶ 24 n.13, 25 n.14, 32(d)). Certain wallets were used purely as passthrough accounts to move proceeds from one wallet or account to another.   (*Id.* ¶ 27).

As a result of the Government's ongoing investigation after filing the Indictment, the Government identified an extensive network of anonymous Ethereum wallets and multiple accounts held under false names and pseudonym email accounts that co-defendant Nikhil Wahi used to buy and sell crypto assets and to then funnel the proceeds to other accounts and wallets. This network of anonymous Ethereum wallets and centralized crypto exchange accounts utilized by the defendant's co-conspirators is depicted graphically in Exhibit B of the Seizure Affidavit (*see* page 72 of the Seizure Affidavit). Even this graphical depiction does not capture the full scope of anonymous Ethereum wallets and centralized accounts used by the scheme participants in connection with the scheme. Similarly, the Government's investigation revealed that Ramani used a host of anonymous Ethereum wallets and accounts held at centralized cryptocurrency exchanges in the names of others.  The Government's post-Indictment investigation further revealed that Nikhil Wahi and Ramani coordinated with each other to move proceeds, and used an account held at a centralized exchange by a nominal owner in this regard. (Seizure Affidavit ¶ 25-27; ¶ 24(b) & n.12).

As the defendant concedes in his sentencing submission, he personally received approximately 10.97 ETH and 9440 USDT from Sameer Ramani, which represented a portion of Ramani's trading profits.   (Def. Sentencing Mem. at 18).   It bears noting that the wallet that the defendant used to receive these proceeds was anonymous in nature, would not be readily tied to the defendant, and had limited transaction history prior to receiving the transfers of the proceeds. Thus, rather than receive proceeds in an account held under his own name, the defendant instead chose to receive proceeds in a fashion aimed at avoiding detection.

*The Defendant Continues to Tip Even After the Scheme Draws Public Attention*

On or about April 12, 2022, a Twitter account that is well known in the crypto community and that had hundreds of thousands of followers tweeted that it had identified an Ethereum

blockchain wallet "that bought hundreds of thousands of dollars of tokens exclusively featured in the Coinbase Asset Listing post about 24 hours before it was published."  (PSR ¶ 31).  The trading activity referenced in the April 12 tweet was trading that had been caused by Sameer Ramani on April 11, 2021 based on Coinbase confidential business information provided by the defendant.  On April 13, 2022, Coinbase's Chief Security Officer publicly replied on Twitter to the April 12, 2022 tweet, and stated that Coinbase had already begun investigating the matter. (PSR ¶ 31).

Even after the scheme had been publicly flagged on Twitter and after Coinbase had publicly stated that it intended to investigate the matter, the defendant persisted in misappropriating Coinbase confidential information regarding impending token listings and tipping his brother.  Indeed, on April 25, 2022 and April 27, 2022, Nikhil Wahi purchased approximately hundreds of thousands of dollars of crypto tokens shortly before Coinbase publicly announced that it would be listing those tokens on its exchanges, and then sold those tokens for large profits shortly after Coinbase's listing announcement. (Seizure Warrant at ¶ 28(g)-(h); 30(c)(xvii)-(xviii)).

*The Defendant's Attempt to Flee the United States*

On April 28, 2022, Coinbase's Chief Executive Officer posted on the company's publicly accessible blog that the company was investigating whether "someone inside Coinbase" leaked the company's confidential information "to outsiders engaging in illegal activity," and that any Coinbase employee who engaged in such activity would be "immediately terminated and referred to relevant authorities (potentially for criminal prosecution)."  (PSR ¶ 32).  On May 11, 2022, the company's director of security operations emailed the defendant to inform him that he should appear for an in-person meeting relating to Coinbase's asset listing process at Coinbase's Seattle,

Washington office on May 16, 2022.   The defendant confirmed he would attend the meeting.
(*Id.*)

After learning that he was going to be interviewed as part of Coinbase's investigation, the defendant attempted to leave the United States and flee to India.   In particular, on the evening of Sunday May 15, 2022, the night before his meeting with Coinbase was scheduled to occur, the defendant purchased a one-way ticket for a flight to New Delhi, India that was scheduled to depart approximately 11 hours later, shortly before the defendant was supposed to be interviewed by Coinbase.   (PSR ¶ 33).   In the hours between booking the flight and his scheduled departure time on May 16, 2022, the defendant separately called and texted Nikhil Wahi and his other co-defendant, Sameer Ramani, about Coinbase's investigation and sent Nikhil Wahi and Ramani a photograph of the messages that he (Ishan Wahi) had received on May 11, 2022 from Coinbase's director of security operations.   (PSR ¶ 34).   Prior to boarding his May 16, 2022 flight to India, the defendant was stopped by law enforcement and arrested on a material witness warrant.   On his way to board his one-way flight, the defendant had with him an extensive array of his belongings, including, among other items, three large suitcases, seven electronic devices, two passports, multiple other forms of identification, hundreds of dollars in U.S. currency, financial documents, and other personal effects and items.   (PSR ¶ 35).

## PROCEDURAL HISTORY

On July 19, 2022, the defendant was charged in Indictment 22 Cr. 392 with two count of wire fraud conspiracy (Count One) and two counts of wire fraud for his role in the above-described scheme.   On July 21, 2022, the defendant and his co-defendant Nikhil Wahi were arrested in the Western District of Washington and ordered released on bail conditions.   Defendant Sameer Ramani remains at large.

On February 7, 2023, the defendant pleaded guilty pursuant to a plea agreement with the Government to Count One of the Indictment, which pertains to his participation in a conspiracy to misappropriate Coinbase confidential business information and provide that information to Nikhil Wahi to trade on, and Count Two, which pertains to his participation in a conspiracy to misappropriate Coinbase confidential business information and provide that information to Sameer Ramani to trade on

The stipulated Guidelines range contained in the parties' plea agreement and the Guidelines range calculated by Probation Office in the PSR are in accord: Counts One and Two group pursuant to U.S.S.G. § 3D1.2(d); the base offense level pursuant to U.S.S.G. § 2B1.4(a) is 8; because the gain resulting from the offense was more than $550,000 but less than $1.5 million, 14 levels are added pursuant to U.S.S.G. § 2B1.4(b)(1) and 2B1.1(b)(1)(H); because the defendant occupied and abused a position of special trust in a manner that significantly facilitated the commission or concealment of the offense, two levels are added pursuant to U.S.S.G. § 3B1.3 and § 2B1.4, Application Note 2; and a three-level reduction will be warranted pursuant to U.S.S.G. § 3E1.1(a) and (b) assuming the defendant has accepted responsibility to the satisfaction of the Government prior to the imposition of sentence and because the defendant gave timely notice of his intention to enter a plea of guilty. (PSR ¶ 44-55).   Accordingly, the total offense level is 21.   (PSR ¶ 55). The defendant's criminal history category is I.   Accordingly, the applicable Guidelines range is 36 to 47 months' imprisonment.

## **DISCUSSION**

In light of the lengthy and protracted nature of his offense, the sophistication and deception inherent in the crime, the defendant's significant abuse of the trust of his employer, and the defendant's personal history and characteristics, a term of imprisonment within the advisory Guidelines range of 37 and 46 months is necessary to meet the statutory ends of sentencing,

including just punishment, deterrence, and promoting respect for the law.   The defendant's request of a sentence of 10 months' imprisonment – which would be identical to the sentence imposed by this Court on co-defendant Nikhil Wahi – would not adequately reflect the seriousness and wrongfulness of the defendant's conduct, would result in unwarranted sentencing disparities, and would be contrary to the sentencing goals of 18 U.S.C. § 3553.   Moreover, and as the Government emphasized at the sentencing of co-defendant Nikhil Wahi, general deterrence is also an important factor that should weigh heavily in favor of a Guidelines sentence in this case.   A sentence within the Guidelines range will send a strong signal to those who work in the cryptocurrency industry and regularly have access to confidential business information that misappropriating and using such information for personal profit and to tip others is a serious offense that will be met with serious punishment, including a lengthy jail term.

### A.   Nature and Circumstances of the Offense and the Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment

The defendant's offense involves a serious breach of trust and warrants substantial punishment in order to reflect the seriousness of the offense, promote respect for the law, and provide just punishment.   The defendant engaged in an extended course of illegal conduct over a period that spanned approximately 10 months.   The defendant's crime involved a substantial abuse of the trust that Coinbase had placed in him as a member of the company's digital asset listing team.   The defendant was not similarly situated to most other Coinbase employees.   He had access to highly confidential and sensitive information regarding Coinbase's impending token listings and the timing of those listings.   This information moved crypto markets and was highly valuable.   If a trader knew with definitive certainty that Coinbase was going to list a particular token and knew the precise timing when Coinbase's public announcement would occur, that trader could profit richly.   That is precisely what the defendant and his co-conspirators did using the

information pilfered by the defendant—they misappropriated and misused information entrusted to the defendant in order to gain an unlawful advantage in the cryptocurrency market.

Rather than closely guard and protect this highly sensitive and valuable commercial information, as he had promised Coinbase that he would, the defendant instead repeatedly stole this sensitive information and tipped his brother and his friend so that they could profitably trade. The defendant understood the wrongfulness of this conduct.   Coinbase's policies were clear.   He was warned that the information he was receiving about token listings was highly confidential. And he was trained as to the potential consequences should he misappropriate Coinbase's confidential business information, including that such conduct could lead to criminal consequences and jail time.   None of that stopped the defendant from over and over again stealing Coinbase's confidential business information and tipping his brother and his friend.   When trading by his co-conspirator Ramani was flagged on Twitter in mid-April 2022 and drew scrutiny, including from Coinbase, he still persisted in his criminal scheme by continuing to tip Nikhil Wahi through late April. And when Coinbase's own internal investigation focused on him and led to Coinbase requesting to interview the defendant, rather than face the consequences he instead tried to run. But, fortunately, law enforcement was already on the defendant's trail and detained him before he could escape the country with practically all of his earthly possession in tow.

As the Government underscored in connection with the sentencing of co-defendant Nikhil Wahi, this insider trading scheme qualitatively differs from many other insider trading cases prosecuted in this District and elsewhere.   Frequently, such prosecutions involve trading around a single corporate announcement or, in some instances, a handful of announcements.   Here, the defendant chose to tip his brother and his friend again and again, and they ultimately profited collectively to the tune of practically $1.5 million.   The defendant used his routine access to

confidential Coinbase information regarding token listings in order to routinely tip his brother and his friend over a 10-month period.

Finally, it bears noting that the defendant's co-conspirators and the defendant himself engaged in extensive and sophisticated efforts to conceal their activities.   While the evidence obtained by the Government's investigation identified one wallet that the defendant used to receive a portion of the illegal trading proceeds, the manner in which the defendant received those proceeds was designed to conceal his activities.

## B.   General Deterrence

A sentence within the advisory Guidelines range of 37 to 46 months' imprisonment is also necessary in this case to afford adequate deterrence to criminal conduct.   *See* 18 U.S.C. § 3553(a)(2)(B).   The legislative history of 18 U.S.C. § 3553 demonstrates that "Congress viewed deterrence as 'particularly important in the area of white collar crime.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225, at 76 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3259); *see also United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress").   General deterrence is seen as an important sentencing factor in fraud and white collar cases, because it is seen as effective. *Martin*, 455 F.3d at 1240 ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.") (quotation marks and citation omitted).   The Second Circuit and courts in this district have noted the appropriateness of significant sentences in the context of financial crimes, including specifically insider trading, committed by defendants who make the calculation that white collar crime is "a game worth playing."   *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) (quoting district court and affirming sentence of 66 months' imprisonment for insider trading offense); *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012) ("As this Court

has repeatedly noted in other cases, insider trading is an easy crime to commit but a difficult crime to catch. Others similarly situated to the defendant must therefore be made to understand that when you get caught, you will go to jail.").   A Guidelines sentence will appropriately signal to others contemplating insider trading that that their conduct will be met with serious punishment.

This defendant stands before the Court as the second defendant and the first corporate insider convicted of tipping others so that they could trade on crypto assets based on confidential business information.   The sentence imposed here will serve as an important example to others who may be tempted to engage in insider trading in the cryptocurrency markets.   The temptation to engage in such conduct is just as real in the crypto markets as it is in the equity markets.   Each and every time any major cryptocurrency exchange intends to list a crypto token on its exchanges – which is a regular occurrence on these cryptocurrency exchanges – there are typically numerous employees of these exchanges and others who are part of the development team for the relevant crypto tokens who possess advanced knowledge of the planned listing.   Such listings frequently impact the price of the relevant crypto tokens.   By imposing a sentence within the range proposed by the Government, this Court will send a clear and unequivocal message to those tempted to engage in insider trading in crypto assets that such conduct will be treated just as this conduct is treated in the equity markets, and that those who cross the line can be assured they will likely face jail time.   When crimes like this one are uncovered and successfully prosecuted, it is critical that they serve as examples to other insider trading criminals and would-be criminals.   Here, the imposition of a term of incarceration is critical to that end.   It is that element of punishment that is necessary to effectively prevent people from engaging in such crime in the first place.

Deterrence is additionally of particular import in this case because the sophistication of the scheme makes crimes such as these particularly difficult to detect and prosecute.   Indeed, while traditional insider trading in the equity markets is in and of itself a difficult crime to detect and

prosecute, when this conduct occurs in the crypto markets it is even more difficult to uncover and prosecute.   This is due to the fact that those who choose to engage in insider trading in crypto assets can easily conceal their involvement including by, among other things, making use of anonymous Ethereum wallets that have no actual link to their identity, using various forms of technology to conceal their true internet protocol ("IP") addresses, and opening accounts at various offshore cryptocurrency exchanges without providing any identity documentation.   Accordingly, deterring the already difficult to detect crime of insider trading is particularly necessary in the context of the crypto markets, where uncovering and prosecuting such crimes is even more challenging for law enforcement.   *See Gupta*, 904 F. Supp. 2d at 355 ("As this Court has repeatedly noted in other cases, insider trading is an easy crime to commit but a difficult crime to catch. Others similarly situated to the defendant must therefore be made to understand that when you get caught, you will go to jail."); *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it."); *see also United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018) (citing *Heffernan*).

The defendant's arguments that general deterrence has been achieved as a result of the notoriety of this case is unavailing.   (Def. Sentencing Mem. at 35-38).   The fact that this case has received extensive media attention and that a basic Google search of the defendant's name quickly results in news articles relating to this case does not change the fact that a Guidelines sentence is necessary to promote general deterrence.   Defendants simply knowing that their conduct can result in negative publicity and notoriety is not sufficient to promote general deterrence.   It is the possibility that individuals may face substantial consequences up to and including substantial terms of incarceration that are far more likely to change the future behavior of others.   The mere

fact that the defendant's case has been widely reported in the media does not justify a lesser sentence or militate against general deterrence being a significant factor.  Indeed, the Second Circuit has stated that simply because a case has been widely reported on and drawn notoriety does not suggest that imprisonment is not required to promote general deterrence:

> [T]he circumstances referred to by the district court do not constitute punishment. The public nature of criminal prosecutions is part of our constitutional fabric; the public humiliation suffered by one prosecuted and convicted of a crime is an ordinary consequence of his conduct, not a condition imposed by the criminal codes or the judicial process. These circumstances, though adverse, are not what § 3553(a)(2)(A) means by "punishment." Hence they cannot properly be viewed as fulfilling the need for the imposition of just punishment. And given that the more massive a fraud, the more likely it is that the prosecution will generate publicity, the logical extension of the district court's view—i.e., that Freedman's public humiliation and the public nature of his prosecution were punishment enough—would mean that the more flagrant the crime, the less actual statutorily prescribed "punishment" it would require. And of course, the less punishment that is meted out, the less deterrent effect the sentence will have on others contemplating similar crimes.

*United States v. Cutler*, 520 F.3d 136, 171 (2d Cir. 2008).

The publicity this case has received if anything weighs in favor of a substantial sentence. This case presents an appropriate opportunity for the Court to send a strong signal to market participants, and, especially in light of the publicity to which the defendant points, an unjustifiably lenient sentence would encourage others who might be tempted to engage in fraudulent misappropriation that the rewards of such wrongful activity may be worth the price.  *See, e.g., United States v. Ulbricht*, 858 F.3d 71, 94 (2d Cir. 2017) (affirming district court's sentence which took into account, among other things, general deterrence and the fact that the sentence imposed "could have a powerful general deterrent effect because the case had attracted an unusually large amount of publicity.").

**C.     The Sentence Proposed by the Defendant Would Result in Unwarranted Sentencing Disparities**

The defendant proposes in his submission that a sentence of 10 months' imprisonment – which is identical to the sentence imposed on Nikhil Wahi – is sufficient to vindicate the Section 3553(a) factors.   Such a sentence, however, would result in an unwarranted sentencing disparity in this case.   While Nikhil Wahi's offense conduct was undoubtedly serious, Ishan Wahi's conduct was undoubtedly more serious.   It was Ishan Wahi who occupied a position of trust with Coinbase and betrayed that trust by misappropriating Coinbase's confidential business information regarding token listings.   His brother owed no such duties to Coinbase.   His brother did not directly engage in deception of Coinbase.   Furthermore, Ishan Wahi;s conduct involved broader wrongdoing.   Ishan Wahi tipped not just Nikhil Wahi, but also repeatedly tipped his friend Sameer Ramani. The loss attributable to the defendant is nearly $1.5 million, while the loss amount attributable to Nikhil Wahi was based solely on his own trading.[2]

The heart of the crime in this case was the defendant's breach of his duties of trust and confidence to Coinbase by misappropriating Coinbase's confidential business information. Accordingly, sentencing Ishan Wahi to the exact same term of imprisonment as Nikhil Wahi would result in an unwarranted sentencing disparity.   Indeed, it is for that reason that the Guidelines recognize that, typically, tippers in insider trading schemes who are insiders and occupy and abuse a position of special trust deserve lengthier sentences than those who they tip, who did not occupy such a position of trust. *See* U.S.S.G. § 3B1.3 and § 2B1.4, Application Note 2.

---

[2] The Guidelines range of 10 to 16 months' imprisonment for Nikhil Wahi was based on the gains the Government had uncovered at the time of the plea, which were only $54,100.   As this Court is aware, following the plea but prior to Nikhil Wahi's sentencing, the Government uncovered additional trading that revealed Nikhil Wahi had generated nearly $900,000 in gains.

In his submission, the defendant argues that a Guidelines sentence would result in unwarranted sentencing disparities.   But the underlying facts of certain of the cases the defendant relies on are readily distinguishable from the defendant's offense conduct.   For example, the defendant cites to the three-month sentence imposed in *United States v. Jung*, 18 Cr. 518 (LAK), which involved an employee of an investment bank tipping his brother about impending deals that his bank was working on.   But it bears noting that Jung's scheme led to trading profits of only approximately $130,000, and that the defendant's Guidelines range was 18 to 24 months' imprisonment.

Another case cited in the defense submission – *United States v. Pinto-Thomaz*, 18 Cr. 579 (JSR) – is likewise readily distinguishable.   *Pinto-Thomaz* involved a gain amount between $250,000 and $500,000. 18 Cr. 579, Dkt. No. 146, at 10.   Pinto-Thomaz also tipped his co-conspirators regarding one upcoming acquisition.   He did not provide a constant stream of tips. Thus, the scope of the scheme and the magnitude of the trading were far more limited.

The defendant further cites to the recent sentencing in the Eastern District of New York in *United States v. Peltz*, 21 Cr. 154 (NG) (E.D.N.Y.).   *Peltz*, however, involved the defendant obtaining MNPI from an insider regarding a potential takeover bid, which the defendant then used to profitably trade and to tip others.   21 Cr. 154 (E.D.N.Y.), Dkt. No. 59, at 1-2.   *Peltz* differs materially from this case in a few respects.   First, the defendant in *Peltz* was not himself an insider at the company and did not betray his duties of trust and confidence to his employer, unlike the defendant here.   Second, *Peltz* did not involve a stream of tipping.   Rather, the defendant traded on and tipped on one discrete corporate event.   Finally, the personal circumstances of the defendant in *Peltz* differ substantially from the circumstances of Ishan Wahi's life.   In *Peltz*, the defendant had experienced an "extraordinarily tragic childhood."   (21 Cr. 154 (E.D.N.Y.), Dkt. No. 61).   These circumstances were so tragic that the Government itself acknowledged in its own

submission "the difficulty of making one's way after enduring what the defendant has" and the defendant's difficult personal history "informed the government's recommendation of a sentence below the applicable Guidelines range."   (21 Cr. 154 (E.D.N.Y.), Dkt. No. 59).   This is a far cry from this case.   The defendant received a top caliber education in the United States and received the opportunity to excel in a high-paying white collar job.   Rather than use these advantages to the fullest, the defendant instead chose to use his sensitive position at Coinbase steal valuable information so that his brother and his friend could profit from it.

**D.     The Defendant's Submission Does Not Provide Any Compelling Rationale for a 10-Month Sentence**

In addition to the defense arguments addressed above, the defendant raises a number of additional rationales in support of his request for a sentence of 10 months' imprisonment. Although the Court certainly can and should take these additional matters into account, this Court should reject that proposed sentence as inadequate to vindicate all of the relevant section 3553(a) factors.

### 1.   <u>The Gain Calculation Does Not Lead to Unjustified Results</u>

The defendant argues in his submission that the 14 points assessed to the defendant based on the gain amount is based on the "monetary gain by others, over which amounts Ishan had little knowledge and less control, whereas the conduct at the heart of the government's misappropriation theory is assessed at only 2 points."   (Def. Sentencing Mem. at 21-22). The defendant also emphasizes in his submission that he "had no control and little knowledge over the extent to which those co-conspirators traded on the information he provided them" and that his own personal gain consisted solely of approximately 10.97 Ethereum tokens and 9,440 Tether tokens. (Def. Sentencing Mem. at 24).   These arguments ignore, however, a few important facts.   First, the defendant's actions benefited him because, by tipping a close family member, his brother, the

defendant's actions and his brother's profits redounded to his own benefit.   Thus, the fact that the tippees did the trading and held the profits at the time the scheme was cut short by law enforcement does not substantially mitigate the defendant's role here.   Without the defendant, there would have been no profits in the first place.

Second, and more importantly, it was, in fact, readily foreseeable to the defendant that his co-defendants would trade extensively because the defendant tipped them extensively.   If the facts were that the defendant provided one or two isolated tips and then his co-conspirators placed huge trades based on that information that the defendant could not have possibly foreseen, that would be bad enough.   But here, the defendant kept tipping on a repeated basis, often tipping on multiple tokens at a time.   By feeding his brother and his close friend with a consistent stream of tips, it was certainly very much foreseeable and entirely in the defendant's control that his co-conspirators would generate sizeable profits with his information.   Thus, the notion that "Ishan's part in the conspiracy ended when he communicated confidential information" and that he had "no control and little knowledge over the extent to which those co-conspirators traded on the information" rings hollow in light of the consistent stream of tips the defendant was providing.

2.   Collateral Consequences Do Not Support a 10-Month Sentence

In addressing specific deterrence, the defendant's submission points to a litany of collateral consequences that have befallen the defendant as a result of his indictment and conviction. Undoubtedly, this prosecution has had numerous serious negative effects on the defendant's life, including his mental health, his finances, his job prospects, his reputation, and his ability to remain in the United States.   The Government does not wish to make light of any of these very real consequences that have resulted as a result of the defendant's prosecution.   This Court should take all of this into account in fashioning an appropriate sentence.

While the Government does not dispute that the defendant has suffered significant adverse consequences as a result of his prosecution and conviction in this matter, that fact alone cannot justify the lenient 10-month sentence proposed by the defendant.   Such collateral consequences should not be given undue weight and do not ultimately dictate that a lenient sentence is appropriate. Indeed, courts appropriately disfavor placing undue weight on the collateral consequences that a defendant in a white-collar job suffers as a result of a conviction.   Giving such an argument undue weight would unfairly favor white collar criminals above others.   *See, e.g., United States v. D'Amico*, 496 F.3d 95, 107 (1st Cir. 2007) (vacating former city councilor's four-month sentence for Hobbs Act extortion and false statements offenses, which sentence varied downwardly 88% from a Guidelines range of 31 to 44 months, where the variance was premised significantly on the collateral consequences of conviction faced by the defendant), *vacated on other grounds by* 552 U.S. 1173 (2008); *id.* at 106-07 (noting that giving substantial variances in sentencing to white collar defendants who "often have achieved more tangible successes than other defendants . . . will inevitably lead to sentencing courts treating white collar defendants more leniently (in the relative sense) simply because of their societal status -- a result that would be contrary to one of Congress' primary objectives in enacting the current federal sentencing scheme"); *see also United States v. Rattoballi*, 452 F.3d 127, 135 (2d Cir. 2006) (noting that "[e]very convicted felon suffers from the indignity and ill-repute associated with a criminal conviction," and that reliance on such so-called "collateral consequences is contrary to 18 U.S.C. § 3553(a)(6), which calls for a reduction in unwarranted disparities among similarly situated defendants").

With respect to his impending deportation, treating this fact alone as a basis for an unduly lenient sentence would amount to a "non-citizen" bonus where non-citizens who commit crimes in the United States do not face the same custodial sentences as U.S. citizens who commit the same

sorts of offenses because U.S. citizens do not face the additional adverse consequence of deportation as a result of their conviction.  In any case, the adverse immigration consequences here—which result from the defendant's choice to abuse the laws of this country notwithstanding his status—cannot justify a sentence of 10 months' imprisonment in this case, given the nature and circumstances of the offense, the need for general deterrence, and the need for just punishment.

## <u>CONCLUSION</u>

For the reasons discussed above, the Government respectfully submits that  Guidelines sentence should be imposed.  A sentence between 37 and 46 months' imprisonment would be sufficient but not greater than necessary to serve the legitimate ends of sentencing.[3]

Dated:  New York, New York
        May 2, 2023

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:      /s/ Noah Solowiejczyk
        Noah Solowiejczyk
        Nicolas Roos
        Assistant United States Attorneys
        Tel. (212) 637-2473/2421

---

[3] The Court should also order forfeiture and restitution.  With respect to forfeiture, the parties have agreed that forfeiture is warranted.  A consent preliminary order of forfeiture was entered at the time of the defendant's guilty plea as to certain specific crypto assets.  With respect to restitution, the Government will provide a proposed restitution order to the Court in advance of sentencing.  The Government previously submitted a letter in support of restitution with respect to co-defendant Nikhil Wahi, and the defendant is jointly and severally liable with his co-defendant. (Dkt. No. 86).  The Government recently provided counsel to both defendants underlying legal billing records in support of the restitution amount to provide them adequate opportunity to understand the basis for the proposed restitution figure.